IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES LUDWIG and | : | CIVIL ACTION |
| KRISTEN HUGHES | : | |
| | : | |
| vs. | : | |
| | : | |
| UNITED STATES OF AMERICA | : | NO. 10-4803 |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**ROBERT F. KELLY, SR. J.**                                                                 **JUNE  6,  2012**

**FINDINGS OF FACT**

1.  This personal injury lawsuit arises from a motor vehicle accident that occurred on January 18, 2008 (N.T. 7, 10)[1].

2.  The motor vehicle accident was a two car collision that occurred in the southbound lanes of Roosevelt Boulevard in Philadelphia, Pennsylvania.  (N.T. 7, 10).

3.  Plaintiff Kristen Hughes (hereinafter referred to as "Plaintiff Hughes") is 31 years old, and lives with her fiancee, Plaintiff James Ludwig (hereinafter referred to as "Plaintiff Ludwig") in Bensalem, PA with her three year old son.  (N.T. 5, 6).

4.  Plaintiff Ludwig is 63 years old (N.T. 47).

5.  Plaintiff Hughes was the driver of the 1996 Mitsubishi Galant that was involved in the motor vehicle accident on January 18, 2008.  (N.T. 7).

6.  Plaintiff Ludwig was a front seat passenger in the Hughes vehicle at the time of the accident in question.  (N.T. 54).

7.  On the date of the accident, Gary Schammel was in Philadelphia for work-related

---

[1] Unless otherwise indicated all references to notes of testimony refer to April 16, 2012.

training.  (N.T. 143).

8.  After the training, he began to travel home to Baltimore, Maryland.  (N.T. 144, 153). At the time of the accident, Gary Schammel was driving a 2003, red Volkswagen Beetle. (N.T. 38, 152, 130).

9.  At the time of the accident, Gary Schammel was operating his vehicle in the course and scope of his federal employment with an agency of the United States.  (Compl., para. 4; Answer of U.S. to Compl., para. 4).

10.  The weather conditions at the time of the accident were clear and dry.  (N.T. 8-9, 181).

11.  Roosevelt Boulevard in the vicinity of the accident is a 12 lane divided highway with six northbound lanes and six southbound lanes.  The six southbound lanes are divided by a grass median into three inner lanes and three outer lanes.  (N.T. 10-11).

12.  Gary Schammel was traveling in the middle lane of the three local outer lanes at about 30 to 35 miles per hour. (N.T. 149, 159).

13.  Also around that time, Plaintiff Hughes was driving her vehicle, a 1996 Mitsubishi Galant southbound on Roosevelt Boulevard in the same direction as Gary Schammel and in the right lane of the three outer lanes nearest the sidewalk.  (N.T. 7, 10-12, 130). Plaintiff Ludwig was her passenger.  (N.T. 8).  Plaintiffs were on their way to a furniture store.  (N.T. 54-55).

14.  Suddenly and without warning, Plaintiff Hughes' vehicle struck the right passenger side mirror and the right front fender panel of Gary Schammel's vehicle near the right wheel as she sped by him on his right.  (N.T. 145-146, 40).  Neither Plaintiff nor Gary Schammel saw one another prior to the accident.  (N.T. 40, 88, 146).

15. Schammel testified that the impact of the accident was minimal and felt like "someone kicking your car", it "felt like nothing." (N.T. 148-149, 161).

16. Plaintiff Ludwig testified that the impact knocked him into the door, denting the door, and that he bumped his right knee, bumped his right shoulder, jerked his head to the right and to the left, hit his left knee on the dashboard, and struck his left hip on the console between the seats. (N.T. 88). Plaintiff Hughes testified that the impact sent her moving forward and backward. (N.T. 41). Plaintiff Hughes also testified that there was one impact from the accident. (N.T. 40).

17. Schammel looked over at Plaintiff Hughes' vehicle when it struck him, and he saw Plaintiff Hughes talking on a cell phone. (N.T. 145-146). Plaintiff Hughes continued talking on the cell phone as both parties slowed their vehicles and pulled over. Id. Schammel's exact testimony on this point is as follows: "She never even took the phone away. It is like I was bothering her. She went blowing by me. She hit her mirror into my mirror and my mirror was broken forward." Id.

18. Schammel also testified, "Her hubcap hit my right front outer, right in front of the tire there is a little two inch black mark on my bumper and that hubcap just grabbed it, folded it up and shot it straight in the air.

When I got out of the car I also picked up her mirror and popped her mirror back in, but mine was broken forward, because she actually hit me driving mine forward. Hers folded back into her car and then dropped the lens out." (N.T. 150).

19. After the parties came to a stop, Schammel offered to pay for Plaintiff Hughes' hubcap rather than go through insurance to replace it. (N.T. 150). He was not admitting any

fault when he did this. Id.

20. At the time, Gary Schammel also noticed old damage to Plaintiff Hughes vehicle. (NT. 150, 151). Plaintiff Hughes told him she had been in previous accidents. (N.T. 150).

21. Plaintiff Hughes, not Plaintiff Ludwig, called the police on Plaintiff Ludwig's cell phone to report the accident. (N.T. 23, 58).

22. Officer Debiase of the Philadelphia Police Department responded to the scene. (N.T. 125). At trial the officer remembered that there was minor front end damage to both vehicles and that Plaintiff Hughes' driver side hubcap was damaged. (N.T. 127, 130-31). He testified that none of the parties to the accident reported injuries. (N.T. 35).

23. Officer Debiase also remembers that the parties had a "dispute" and argued over the lane change, and that Gary Schammel did not admit to changing lanes. (N.T. 131, 132).

24. Both parties were able to drive their vehicles away from the accident. (N.T. 44).

25. Immediately after the accident, Plaintiffs Hughes and Ludwig went shopping at Raymour and Flanigan furniture store for an hour and put a down payment on some furniture. (N.T. 63, 89). They then went home to relax. (N.T. 89).

26. Later that same evening, Plaintiffs Hughes and Ludwig drove to Jeanes Hospital in Philadelphia. (N.T. 89-90). Plaintiffs were discharged within an hour with Motrin and Aleve. (N.T. 90).

27. Both Plaintiffs Hughes and Ludwig went to see Dr. Geoffrey Temple, D.O., three days later on January 21, 2008. (N.T. 90). Dr. Temple's area of practice is in primary care/family medicine. (Plaintiffs' Ex. 10). Neither Plaintiff had ever seen Dr. Temple prior to this date. (Plaintiffs' Ex. 10; N.T. 90, 64).

28. The accident happened on a Friday.  (N.T. 90).  Plaintiffs visited Dr. Temple for the first time on Monday.  Id.  Sometime between Friday and Monday, Plaintiffs had already hired a lawyer before they visited Dr. Temple.  Id.

29. In the course of treating Plaintiffs, Dr. Temple never reviewed Plaintiff Ludwig's medical records from Jeanes Hospital.  (Plaintiffs' Ex. 11).

30. Dr. Temple also never reviewed Plaintiff Ludwig's medical records from his prior accidents, including the car accident in November 2005 in which Plaintiff Ludwig was broadsided by another vehicle and sustained injury to his neck and a bulging disc in his lower back.  (Plaintiffs' Ex. 11).  Dr. Temple admits that those records would affect his opinion.  Id.

31. On March 8, 2008, Dr. Temple asked Plaintiff Hughes to seek a consultation with an orthopedic specialist, Dr. Mark Avert, a request that Plaintiff Hughes ignored for a year and a half.  (Plaintiffs' Ex. 10).

32. Dr. Temple was concerned that Plaintiff Ludwig was seeing him to obtain Percocet prescriptions, as Dr. Temple knew Plaintiff Ludwig to be an admitted addict.  (Plaintiffs' Ex. 11).

33. On May 16, 2008, Plaintiff Ludwig admitted to Frankford Hospital that he had taken a friend's Methadone and Oxycodone.  (Plaintiffs' Ex. 11).  He also told Frankford Hospital at that time that he was interested in narcotic therapy.  (Plaintiffs' Ex. 49).

34. On July 9, 2008, at Frankford Hospital, Plaintiff Ludwig declined Dr. Zavitsanos' offer to try forms of pain management other than narcotics.  (Plaintiffs' Ex. 11).

35. On July 15, 2008, Plaintiff Ludwig told Dr. Temple that he would rather take Percocet on an indefinite basis.  (Plaintiffs' Ex. 11).

36. On July 18, 2008, Dr. Zavitsanos then reported that Plaintiff Ludwig testified

positive for pain medication that Plaintiff Ludwig had failed to reveal. (Plaintiffs' Ex. 11). Because of this, Dr. Zavitsanos terminated treatment of Plaintiff Ludwig in July 2008 and told Plaintiff Ludwig that it would be best for him to seek treatment somewhere else. (Plaintiffs' Ex. 11).

37. Dr. Temple released both Plaintiff Hughes and Plaintiff Ludwig from his care that same month. (Plaintiffs' Ex. 11). The following month, Plaintiff Ludwig requested Percocet from Dr. Temple, who then prescribed Plaintiff Ludwig Percocet up until December 2010.[2] (Plaintiffs' Ex. 11).

38. Plaintiff Hughes gave birth on October 16, 2008. (N.T. 95).

39. After six months of no treatment, on January 28, 2009, both Plaintiff Hughes and Plaintiff Ludwig returned to Dr. Temple at the same time, both suddenly complaining of pain again. (Plaintiffs' Ex. 11, 10).

40. A little over a week later, on February 10, 2009, Plaintiffs Hughes and Ludwig filed a civil action in the Court of Common Pleas against the driver of the other vehicle, Gary Schammel. (N.T. 96).

41. Dr. Temple terminated treatment of Plaintiff Hughes on September 28, 2010, a week and half after the Complaint was filed in the instant federal case. (Plaintiffs' Ex. 10).

42. Plaintiff Ludwig was not seen by neurosurgeon, Dr. Bruno, until June 29, 2009, roughly a year and a half after the accident. (Plaintiffs' Ex. 11).

43. On August 21, 2009, Dr. Bruno performed a cervical discectomy and cervical fusion

---

[2]After his Percocet prescriptions ran out in December 2010, Plaintiff Ludwig was arrested and ultimately convicted of intentional possession of a controlled substance, Percocet, by a person not registered under the Pennsylvania Controlled Substances Act. (N.T. 95).

on Plaintiff Ludwig's spine at the C6-7 level. (Plaintiffs' Ex.. 11). Dr. Temple was not present for the discectomy and is not an expert in neurosurgery, even though he attempted to offer an opinion on the cause of the discectomy. Plaintiffs' Ex. 11). Plaintiff Ludwig continues to have pain after the surgery and his condition has not resolved itself even after the surgery. (Plaintiffs' Ex. 11).

44. Steven Becker was called by the defense. He has a Bachelor of Science Degree from Worchester Polytech Institute in Mechanical Engineering. (N.T. 185). He has a Master's in Business Administration from Syracuse University and a Certificate from Northwestern University in Accident Reconstruction. (N.T. 185, 186).

45. Steven Becker analyzed the crash in this case by re-reviewing the police report, the physical evidence, the testimony of the witnesses, and by using 3-D models. (N.T. 193, 194, 204). From this information, he was able to make conclusions about the crash to a reasonable degree of scientific certainty. (N.T. 194, 195; Federal Defendant's Ex. 3).

46. The damage to Plaintiff Hughes' fender and door as seen in photos was pre-existing. (N.T. 194). The damage to Plaintiff Hughes' hubcap and mirror could have been caused by this accident. (N.T. 207). A side-by-side comparison of the two vehicles reveals that the damage to the vehicles (other than hubcap and mirror) does not match up in terms of height of the vehicles. (N.T. 198, 199). An analysis of the two vehicles together with 3-D models shows that the damage to Plaintiff Hughes' vehicle above the wheel and at the back door was not caused by the Volkswagen. (N.T. 200). It is physically possible for the multiple dents seen on Plaintiff Hughes' vehicle to have been caused by one accident, but not the January 18, 2008 single-impact accident as described by the witnesses. (N.T. 201). For the damage above the wheel and to the

back door that is shown in the photo of Plaintiff Hughes' vehicle to have occurred as a result of the January 18, 2008 accident, the occupants of the vehicle would have had to have felt multiple impacts. (N.T. 199).

47. The change in velocity caused by the accident to Plaintiff Hughes' Mitsubishi was less than three miles per hour. (N.T. 194). The principle direction of the force of the impact was longitudinal, i.e., forward and backwards. (N.T. 202).

48. The impact of the accident was a shallow angle side-swipe of less than eight degrees. (N.T. 194). This angle is confirmed by lining up 3-D models of two vehicles according to the damage to the vehicles. (N.T. 204).

49. Dr. Valentina Ngai is a Bio-Mechanical and a Bio-Medical Engineer. She explained that a Bio-Mechanical Engineer is a person who applies physics and engineering principles to biological systems in order to solve problems. She has a Bachelor's Degree in Civil Engineering and a Master's Degree in Mechanical Engineering both from the University of Waterloo. She has a Ph.D in Bio-Engineering from the University of Illinois. (N.T. 219). Dr. Ngai is a licensed professional engineer. (N.T. 220).

50. Dr. Ngai used scientific method to analyze the evidence (the police report, the medical records, the testimony of the parties and the analysis done by Steven Becker) in the case and determined whether there was sufficient force generated by the accident to cause the diagnosed injuries of the occupants. (N.T. 226, 228, 229, 231). She over-estimated force (in favor of Plaintiffs) in order to give the worst case scenario. (N.T. 231, 233). She was able to reach several conclusions using this method. (N.T. 228).

51. There was insufficient force in the shallow angle side-swipe collision on January 18,

2008 to have caused or exacerbated Plaintiff Ludwig's cervical lumbar spine pathology.  (N.T. 228, 229).

52. There was insufficient force in the shallow angle side-swipe collision on January 18, 2008 to have caused Plaintiff Hughes' cervical thoracic and lumbar spine pathology. (N.T. 229).

53. Even with the over-estimation in favor of Plaintiffs, the force resulting from this accident was 8 to 13 times below the minimum level threshold for injury. (N.T. 236). At most a cervical strain and sprain was possible. (N.T. 236). Plaintiffs' statements of how they moved within the vehicle contradict each other and the physical evidence. (N.T. 237). The force of the impact was a longitudinal (forward/backward) force. (N.T. 237). Plaintiffs testified to both forward/backward and side to side movements and it is physically impossible for a single impact accident to cause such movement. (N.T. 237, 241).

54. Dr. Stanley Askin is an Orthopedic Surgeon who has performed thousands of orthopedic surgeries during his over 35 years of practice. (N.T. 4 (4/17/12)). He earned his Bachelor of Science Degree in pre-medicine from Penn State University and a medical degree from Hahnemann Medical College. (N.T. 5 (4/17/12)).

55. Dr. Askin conducted an independent medical examination of Plaintiffs on May 4, 2011. (N.T. 8, 11, 14, 20 (4/17/12)). As part of his examination he met with each plaintiff for about 20 minutes, took a medical history from them, performed a physical examination, and reviewed their previous medical records. (N.T. 5, 14, 20 (4/17/12)). Both Plaintiff Hughes and Plaintiff Ludwig were complaining of lingering pain and physical limitations on the day of the examination. (N.T. 16, 24 (4/17/12)). Plaintiff Ludwig specifically said that he had limited range of motion in his neck, that motion of his neck caused him pain, and that he was having

headaches, all the same complaints he had prior to surgery. (N.T. 24 (4/17/12)).

56. After his examination, Dr. Askin concluded that Plaintiff Hughes was an orthopedically intact woman who did not have any lingering effects of the accident. (N.T. 13 (4/17/12)). The MRI images of disc imperfections in her back failed to show any sign that there had been trauma in the sense of hemorrhage or edema or scarring or bone bruising that would support the notion that she had been traumatically affected by the accident. (N.T. 18 (4/17/12)). Plaintiff Hughes was ambulatory after the event, presented to the emergency room and treated with a family practitioner - circumstantial facts which showed that the accident was not a truly significant event. (N.T. 19, 20 (4/17/12)). There was no demonstration in the medical records that she had been physically altered by the January 18, 2008 accident. (N.T. 18, 19 (4/17/12)).

57. After examining Plaintiff Ludwig, Dr. Askin concluded that Plaintiff Ludwig had not been significantly changed by the car accident and there was no documentation that he had been materially altered by the car accident. (N.T. 25, 26 (4/17/12). Plaintiff Ludwig's medical records showed no signs of trauma such as hemorrhage, edema, bone bruising, or tearing of tissues to the C6-7 disc on which he had surgery. (N.T. 25-27 (4/17/12)). Dr. Bruno's surgery notes and the radiologist's notes concerning Plaintiff Ludwig's MRI do not indicate any trauma to the C6-7 disc. (N.T. 28-29 (4/17/12)). Moreover, the fact that Plaintiff Ludwig still has the same complaints that he had prior to surgery calls into question the accuracy of any conclusion that the C6-7 disc was the cause of his symptoms. (Federal Defendant's Ex. 6).

58. Defendants engaged Tom Aloan to conduct surveillance of Plaintiffs after they met with Dr. Askin from May 26 through June 28, 2011. (N.T. 262, Defense Ex. 7). Plaintiffs were seen frequently lifting their son onto their shoulders or into the car. Plaintiff Hughes carried her

son through the apartment complex; Plaintiff Hughes leaned in her vehicle and carried groceries into a home; Plaintiff Ludwig walked his dog around the neighborhood for miles each day; in one scene Ludwig carried a large trash can full of material the distance of one block with the help of another man; also with the help of another man, Plaintiff Ludwig carried a refrigerator the distance of one block while resting a phone on his shoulder and talking on the phone the whole time; Plaintiff Ludwig had his child sitting on his shoulders while he bent down to the ground to pick up a rock with the child still sitting on his shoulders; Plaintiff Ludwig bent over a pool with his child and dipped the child up and down in the pool. (Defendant's Exs. 7 and 8).

## CONCLUSIONS OF LAW

1. The Federal Tort Claims Act ("FTCA") confers subject matter jurisdiction to district courts over negligence actions against the United States. 28 U.S.C. § 1346(b).

2. In an action under the FTCA, the United States is liable to a claimant to the same extent that a private person "would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

3. In this case, brought pursuant to the FTCA, Pennsylvania law applies because the alleged negligent conduct occurred in the Commonwealth of Pennsylvania. Montaperto v. Split Rock Resort, 765 F.Supp. 852 (M.D. Pa. 1991), aff'd w/o opinion, 958 F.2d 364 (3d Cir. 1992).

4. Plaintiff bears the burden of establishing the elements necessary to prove an action in negligence: (1) the existence of a duty or obligation recognized by law, requiring the actor to conform to a certain standard of conduct; (2) a failure on the part of the defendant to conform to that duty, or a breach thereof; (3) a causal connection between the defendant's breach and the resulting injury; and (4) actual loss or damage suffered by the complainant. Mills Tennis Club,

Inc., 571 Pa. 580, 812 A.2d 1218, 1222 (Pa. 2002); see also Redland Soccer Club, Inc. v. Dep't of the Army, 55 f.3d 827, 851 n. 15 (3d Cir. 1995).

    5. Under Pennsylvania law, "a violation of a statute may be negligence per se upon which liability may be grounded if such negligence is the proximate and efficient cause of the incident." Moore v. Sylvania Elec. Prods., Inc., 454 F.2d 81, 83 (3d Cir. 1972).

    6. A Pennsylvania statute requires that whenever a roadway has been divided into two or more clearly marked lanes for traffic, a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver first ascertains that the movement can be made with safety. 75 Pa. C.S.A. § 3309.

    7. Pennsylvania law defines proximate cause as causation which was a substantial factor in bringing about the injury. Hamil v. Bashline, 481 Pa. 256, 392 A.2d 1280, 1284 (Pa. 1978). Plaintiff is required to show that the defendant's negligence was the proximate cause of his injury by a preponderance of the evidence. Baum v. United States, 541 F.Supp. 1349, 1351 (M.D. Pa. 1982).

    8. The Court finds that Gary Schammel was a credible witness.

    9. The Court finds that Plaintiff Hughes and Plaintiff Ludwig were not credible.

    10. The Court finds that Gary Schammel's offer to pay for Defendants hubcap at the scene of the accident was not an admission of liability, but the expression of anout of state driver wanting to close a very minor accident with a very minor payment, even if it was not his fault.

    11. The accident that is the subject of this lawsuit resulted solely from the negligence of Plaintiff Hughes in operating her motor vehicle in violation of the Pennsylvania Motor Vehicle Code.

12. The United States of America's Counterclaim against Kristen Hughes is denied as moot.

We therefore enter the following Judgment.